# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 17-0402** (Marshall County 16-F-133)

**Jeffery Scott Ward, II,**
**Defendant Below, Petitioner**

**FILED**

**June 11, 2018**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Jeffery Scott Ward, II, by counsel Jason D. Parmer, appeals the Circuit Court of Marshall County's March 30, 2017, sentencing order. Respondent State of West Virginia, by counsel Robert L. Hogan, filed a response. On appeal, petitioner contends that the circuit court committed plain error at trial in using two different definitions of "battery" in its jury instructions and in allowing the State to cross-examine a witness regarding her sexual character.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was indicted for one count of burglary, one count of battery, and one count of brandishing a deadly weapon on February 7, 2017. Approximately one month later, on March 6, 2017, petitioner proceeded to trial on these charges. At trial, Bryan McClelland testified for the State. Mr. McClelland testified that he was in a prior relationship with Danielle Ward from May of 2010 until January of 2016, and they had one child during this time.[1] Mr. McClelland and Ms. Ward broke up for a short period during the summer of 2015 while Mr. McClelland attended a drug and alcohol rehabilitation facility, and Ms. Ward began a relationship with petitioner. Upon Mr. McClelland's completion of rehabilitation, however, he and Ms. Ward resumed their relationship from approximately the middle of August of 2015 until January of 2016. Ms. Ward informed Mr. McClelland that she was pregnant and that the child was his. Following their break-up in January of 2016, Ms. Ward informed Mr. McClelland that the child she was carrying did not belong to him and that it, in fact, belonged to petitioner. Mr. McClelland, therefore, initiated a lawsuit to establish paternity.

Mr. McClelland further testified that, at 1:07 a.m. on September 12, 2016, he was asleep and awakened by his dog jumping off of his bed. Mr. McClelland turned his head and saw a tall

---

[1]Ms. Ward is now married to petitioner.

1

figure standing beside his bed, and this person started hitting him on his head. Once Mr. McClelland gained control of the situation and eventually pinned his attacker to the bed, he realized that it was petitioner who was attacking him. Mr. McClelland testified that petitioner had a gun and a large flat-head screwdriver in his possession. Mr. McClelland also stated that he sustained cuts on his hairline, a broken nose, "big welts" on the side of his face, and a swollen jaw. Mr. McClelland said that he "got cut every time [he] was hit," but he could not testify with any certainty as to whether petitioner struck him with anything other than his fist. The jury was shown pictures of Mr. McClelland's cut, bloodied, and swollen face.

Mr. McClelland further testified that once he gained control, petitioner began stating that he wanted to talk to Mr. McClelland. Mr. McClelland told petitioner, "Drop the screwdriver and I'm going to let you up real slow." Petitioner started to get off the bed, but then quickly reached behind him and pulled a pistol on Mr. McClelland. Petitioner informed Mr. McClelland, "This ends tonight[,]" which Mr. McClelland presumed was a reference to the paternity case. While keeping the gun pointed at Mr. McClelland, petitioner instructed him to wrap a belt around his arm and inject a syringe containing Vicodin, Xanax, and heroin into his arm, which petitioner had with him. Petitioner also informed Mr. McClelland that he planned to anonymously report an overdose.

Mr. McClelland refused to inject the drugs and told petitioner that he would have to shoot him. For a moment, as Mr. McClelland was trying to think of a way out of the situation, he thought petitioner was going to shoot him. Mr. McClelland testified that he stated to petitioner, "If this is about the paternity case, just write something up and I'll sign it that I'm dropping the paternity case." Petitioner then handwrote an agreement for Mr. McClelland's signature, which stated that Mr. McClelland would drop the paternity suit. After Mr. McClelland signed the document, petitioner asked Mr. McClelland where he kept his trash bags. Mr. McClelland answered petitioner's question, and petitioner proceeded to remove Mr. McClelland's sheets, pillows, and pillowcases from his bed, tell Mr. McClelland he was going to file the signed document with the court, tell Mr. McClelland not to call the police or petitioner would kill him, and, ultimately, leave Mr. McClelland's home. Mr. McClelland testified that petitioner left on foot and did not have a vehicle in his driveway. Mr. McClelland then called 9-1-1.

Petitioner testified on his own behalf at trial and offered a contrary version of events. Petitioner testified that he was scheduled to be out of town for job training, and he wished to resolve his differences over the paternity case with Mr. McClelland prior to leaving town. Therefore, petitioner testified that he left for Mr. McClelland's home at approximately 11:30 p.m. on September 11, 2017, and arrived there close to midnight. Petitioner testified that he "beat" on Mr. McClelland's door and rang his doorbell for ten to fifteen minutes before Mr. McClelland answered the door and motioned for petitioner to enter the home. Petitioner testified that he "stepped into the front entryway, and that's when I get cold-cocked." Petitioner stated that, after punching him, Mr. McClelland pulled a shotgun from an entryway closet. Petitioner testified that he grabbed the barrel of the gun, spun it around, and punched Mr. McClelland in the nose. Petitioner further testified that "[o]ne time I punched him in the nose, but there was a scuffle after the fact. I know we threw punches at each other. I can't tell you honestly a bunch landed or not, but I know we were both swinging at that point." Eventually, the scuffle ended, and petitioner claims they walked into the living room and petitioner told Mr. McClelland, "I'm

only here to talk, man. I just want this to end. I want it to be done. I want it to be over with." Petitioner detailed that the two men were "huffing and puffing" and that Mr. McClelland was "bleeding because, unfortunately, I broke his nose. He was pretty well covered with blood. I mean, the front of his T-shirt, it was nice and red." Petitioner testified that, after talking, Mr. McClelland signed the document agreeing to end the paternity suit.

Ms. Ward also testified on petitioner's behalf at trial. Ms. Ward testified that she met petitioner during the summer of 2015 and found out she was pregnant around September of 2015. On cross-examination, the prosecutor asked, "Was that the only time you admit that you had relations with [petitioner] prior to dating?" Ms. Ward responded, "No. We have several times." The State continued, "But you were still together with [Mr. McClelland]?" Ms. Ward stated, "No. I broke up with [Mr. McClelland] before he went to rehab." Without objection, this line of questioning continued:

Q. When did you have – and that's when you first had relations with [petitioner]?

A. Yes. It was not as late as August. It was earlier than that. I would say probably July, maybe June.

. . . .

Q. How many times have you had sexual relations with [petitioner] prior to rekindling your relationship with [Mr. McClelland]?

A. I didn't count. I mean, maybe five.

. . . .

A. Okay. So you're asking me how many times I had sex with my husband in 2016 before –

Q. No. How many times had you had sexual relations with the defendant from the time you met him in Marietta until January of 2016.

A. I already told you about five times.

. . . .

Q. Had you slept with [Mr. McClelland] as well?

A. Not at the same time, no.

Q. So you did not have –

3

A. Whenever [Mr. McClelland] and I rekindled, I was no longer seeing [petitioner].

. . . .

Q. You didn't have relations with him until after January?

A. Correct. I never said that I had relations with him in January of 2016 or before that. You asked me from the time I met him – until that time how many times, and it was the same as it was how many times you asked in general.

Following the close of evidence, the circuit court conferred with counsel to agree on jury instructions. Without objection from petitioner's counsel, the circuit court gave the following instructions that are of relevance to the instant appeal:

The offense charged in Count One of the indictment in this case is nighttime burglary. One of two verdicts may be returned by you under this count of the indictment. They are: One, guilty of nighttime burglary, and two, not guilty.

Burglary is committed when any person breaks and enters, or without breaking – or enters without breaking, either in the daytime or nighttime, a dwelling house or outhouse adjoining thereto, or occupied therewith of another person with the intent to commit a crime therein.

"Dwelling house" shall include but not be limited to a mobile home, house trailer, modular home, factory-built home or self-propelled motor home used as a dwelling regularly or only from time to time, or any other non-motive vehicle primarily designed for human habitation and occupancy and used as a dwelling regularly or only from time to time.

Battery is committed when any person who unlawfully and intentionally makes physical contact with force capable of causing physical pain or injury to a person of another, or unlawfully and intentionally causes physical pain or injury to another person.

Before the [petitioner] can be convicted of nighttime burglary, the State of West Virginia must overcome the presumption that the defendant is innocent and prove to the satisfaction of the jury beyond all reasonable doubt that the [petitioner], in Marshall County, West Virginia, on or about the 12th day of September, 2016; did enter without breaking in the nighttime, or did break and enter the dwelling house belonging to Bryan McClelland with the intent to commit a crime of battery therein.

If after impartially considering, weighing and comparing all the evidence – both that of the State and that of the defendant – the jury, and each member of the jury, is convinced beyond a reasonable doubt of the truth of the charge as to

each of these elements of nighttime burglary, you may find [petitioner] guilty of nighttime burglary as charged in Count One of the indictment.

If the jury, and each one of [sic] member of the jury, has a reasonable doubt of the truth of the charge as to any one or more of these elements of nighttime burglary, you shall find the [petitioner] not guilty.

The offense charged in Count Two of the indictment in this case is battery. One of two verdicts may be returned by you under this count of the indictment. They are: Guilty of battery and not guilty.

Battery is committed when any person unlawfully and intentionally makes physical contact of an insulting or provoking nature with the person of another, or unlawfully and intentionally causes physical harm to another person.

Before the [petitioner] can be convicted of battery, the State of West Virginia must overcome the presumption that the defendant is innocent and prove to the satisfaction of the jury beyond a reasonable doubt that, one, [petitioner], in Marshall County, West Virginia, on or about the 12th day of September, 2016; did unlawfully and intentionally make physical contact with force capable of causing physical pain or injury to the person of [Mr. McClelland], or causing physical pain or injury to the person of [Mr. McClelland].

If after impartially considering, weighing and comparing all the evidence, both that of the State and that of the defendant, the jury, and each member of the jury is convinced beyond a reasonable doubt of the truth of the charges as to each of these elements of battery, you may find [petitioner] guilty of battery as charged.

If the jury, and each member of the jury, has a reasonable doubt of the truth of the charge as to any one or more of these elements of battery, you shall find the [petitioner] not guilty.

After the jury was instructed, it heard closing arguments and began deliberations. At the conclusion of petitioner's trial, the jury found him guilty of all three counts charged within the indictment. The circuit court sentenced petitioner to not less than one year nor more than fifteen years of incarceration for his felony nighttime burglary conviction, to one year of incarceration for his misdemeanor battery conviction, and to one year of incarceration for his misdemeanor brandishing conviction. The circuit court memorialized petitioner's sentence in a March 30, 2017, order, and it is from this order that petitioner appeals.

Petitioner argues on appeal that the circuit court committed plain error in offering two different definitions for "battery" in its instructions to the jury, one of which was no longer in effect at the time the incident occurred. Specifically, prior to June 12, 2014, one committed battery "[i]f any person unlawfully and intentionally makes physical contact of an insulting or provoking nature with the person of another or unlawfully and intentionally causes physical

5

harm to another person[.]" W.Va. Code § 61-2-9(c) (2004). Following an amendment that took effect on June 12, 2014, "[a]ny person who unlawfully and intentionally makes physical contact with force capable of causing physical pain or injury to the person of another or unlawfully and intentionally causes physical pain or injury to another person" has committed battery. *Id.* at § 61-2-9(c) (2014). The 2014 version was in effect at the time petitioner committed battery. Petitioner argues that because the 2014 version requires additional proof of harm – something "more serious tha[n] mere" "physical contact of an insulting or provoking nature" – he was prejudiced by the erroneous and confusing instruction. Petitioner also argues that it is unclear whether the State fulfilled its burden of proving all elements of the offense charged given the incorrect instruction.

We begin by noting that "[t]he general rule is that a party may not assign as error the giving of an instruction unless he objects, stating distinctly the matters to which he objects and the grounds of his objection." *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982); *see also* W.Va. R. Crim. P. 30 ("No party may assign as error the giving or the refusal to give an instruction or the giving of any portion of the charge unless that party objects thereto before the arguments to the jury are begun, stating distinctly the matter to which that party objects and the grounds of the objection[.]"). This Court may, however, "in the interest of justice, notice plain error in the giving or refusal to give an instruction, whether or not it has been made the subject of objection." W.Va. R. Crim. P. 30; *see also id.* at R. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). But the plain error doctrine "is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result." Syl. Pt. 2, in part, *State v. Rogers*, 215 W.Va. 499, 600 S.E.2d 211 (2004). Further, this Court does not ordinarily recognize plain error in the giving of an erroneous instruction, "even of constitutional magnitude, where the giving of the erroneous instruction did not substantially impair the truth-finding function of the trial." *State v. Hutchinson*, 176 W.Va. 172, 342 S.E.2d 138 (1986).

We find that the erroneous instruction did not impair the truth-finding function of the trial and, therefore, did not rise to the level of plain error. The instruction recounting the prior version of the battery statute was given as a general description of battery, but the jury was explicitly and accurately instructed as to what it must find to convict petitioner of battery. Although petitioner argues that the version of the statute under which he was charged "requires additional proof of harm" than the prior version and that "touching a person on the nose could be physical contact of an insulting or provoking nature, but it would not be 'physical contact with force capable of causing physical pain or injury to the person of another[,]'" we find that the evidence is clearly sufficient to support a conviction under the proper version of the battery statute. Mr. McClelland testified that he sustained cuts on his hairline, a broken nose, "big welts" on the side of his face, and a swollen jaw. These injuries were documented by pictures, which were shown to the jury. Indeed, petitioner admitted to the jury that he broke Mr. McClelland's nose and that Mr. McClelland was "pretty well covered with blood." Importantly, petitioner did not dispute that he inflicted these injuries; rather, he argued that he did so in self-defense.

6

There is law holding that a defective instruction may be deemed harmless where the State's evidence is substantial and defendant admits the occurrence of the crime, but relies on a defense of alibi, insanity, or self-defense. In this situation, an instruction which improperly defines the elements of the crime is held not to have misled the jury.

*State v. England*, 180 W.Va. 342, 349, 376 S.E.2d 548, 555 (1988). Because the jury was instructed on the elements necessary to prove battery, the evidence was sufficient to support a battery conviction under the correct version of the statute, and petitioner admitted to punching and breaking Mr. McClelland's nose, we find no plain error in the circuit court's instructions.

Petitioner also argues that plain error resulted from the State's cross-examination of Ms. Ward on her sexual history. Petitioner contends that, prior to the introduction of the evidence concerning her sexual history, the circuit court should have held a *McGinnis* hearing "to determine whether there is a preponderance of evidence to believe the sexual acts occurred, and whether Ms. Ward committed them." *See* Syl. Pt. 2, *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994) (outlining the procedure for admission of evidence of a crime, wrong, or other act). Petitioner contends that "*McGinnis* hearings are required before 404(b) evidence is admitted because a defendant is subjected 'to an unfair risk of conviction' if the jury hears character evidence 'before the trial court has determined by a preponderance of evidence that the acts were committed[.]'" Petitioner also contends that the State's failure to "provide the required pretrial notice of its intention to offer evidence of [Ms]. Ward's wrongs or bad acts . . . effectively ambushed the defense with evidence of [her] sexual character." Finally, petitioner contends that the evidence of her sexual history was irrelevant, or, if minimally probative, the probative value was substantially outweighed by a danger of confusing the issues or misleading the jury.

Rule 404(b) of the West Virginia Rules of Evidence provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Without agreeing that the testimony concerning Ms. Ward's adult relationships amounts to testimony of "wrongs or bad acts" or "arguably immoral conduct," or that it contained "lurid details . . . of Ms. Ward's sexual proclivities," as characterized by petitioner, we note that "[t]his Court has consistently held that evidence which is 'intrinsic' to the indicted charge is not governed by Rule 404(b)." *State v. Harris*, 230 W.Va. 717, 722, 742 S.E.2d 133, 138 (2013) (citations omitted). "'Other act' evidence is 'intrinsic' when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *Id.* at 721, 742 S.E.2d at 137 (citation omitted). Further,

because "the prosecution with its burden of persuasion needs evidentiary depth to tell a continuous story," . . . "[r]es gestae evidence is vitally important in many trials. It enables the factfinder to see the full picture so that the evidence will not be confusing and prevents gaps in a narrative of occurrences which might induce unwarranted speculation[.]"

7

*Id.* at 722-23, 742 S.E.2d at 138-39 (citations omitted). Ms. Ward's relationships with Mr. McClelland and petitioner along with the resultant disputed paternity is evidence intrinsic to the charged crimes. Indeed, in petitioner's opening statement, he framed the case as one in which he "attempted to peacefully resolve the dispute that he and his wife [Ms.] Ward had with [Mr.] McClelland, her ex-boyfriend, in the family courts of Marshall County and Ohio County[,]" i.e., the dispute over which man fathered Ms. Ward's child. Accordingly, petitioner has failed to demonstrate plain error in this regard.

For the foregoing reasons, the circuit court's March 30, 2017, sentencing order is hereby affirmed.

Affirmed.

**ISSUED**:  June 11, 2018

**CONCURRED IN BY**:

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

Justice Loughry, Allen H., II suspended and therefore not participating.